1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OKSANA B., ALEXANDER B., and A.B., <br><br> Plaintiffs, <br><br> vs. <br><br> PREMERA BLUE CROSS, and the TABLEAU SOFTWARE, INC EMPLOYEE BENEFIT PLAN and SALESFORCE.COM HEALTH AND WELFARE PLAN, <br><br> Defendants. | COMPLAINT <br><br><br> CASE NO. _____ |

Plaintiffs Oksana B. ("Oksana"), Alexander B. ("Alexander"), and A.B., through their

undersigned counsel, complain and allege against Defendants Premera Blue Cross("Premera")

and the Tableau Software, Inc. Employee Benefit Plan ("the Plan") and Salesforce.com Health

and Welfare Plan as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  Oksana, Alex, and A.B. are natural persons. The plaintiffs reside in King County,

Washington. OB. and Alexander B are A.B.'s parents.

2. Premera is an independent licensee of the nationwide Blue Cross network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the applicable Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("RISA"). The applicable Plan is either Tableau Software, Inc. Employee Benefit Plan or the Salesforce.com Health and Welfare Plan. Oksana B. and Alexander B. were Participants in the applicable Plan, and A.B. was a beneficiary of the applicable Plan at relevant times.

4. A.B. received medical care and treatment at Second Nature Wilderness Family Therapy ("Second Nature") from February 6, 2019, to June 3, 2019, and Catalyst RTC ("Catalyst") beginning on June 3, 2019. These are licensed treatment facilities located in Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Premera denied claims for payment of A.B.'s medical expenses in connection with his treatment at Second Nature and Catalyst.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because the insurance policy has a forums selection provision which identifies the State of Washington as the appropriate venue.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the applicable Plan are for the benefits due under the terms of the applicable Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the

Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.B.'s Developmental History and Medical Background

9.  As a young child, A.B. excelled academically. He participated in numerous extracurricular activities and even competed at the national level in skiing competitions.

10. A.B. started to have problems around the time that he was in the seventh grade. He was suspended from school after he brought a knife on the bus. When confronted about where he had acquired the knife, he claimed that he had bought it online using a cash card that he had "found."

11. Shortly afterwards A.B. was suspended from school for a time when he was found to be in possession of a significant quantity of vaping paraphernalia and marijuana edibles that he intended to distribute.

12. A.B. was allowed to return to school once he had passed a substance abuse test, but he was suspended the next day for disruptive conduct and lying to teachers. In total, A.B. was suspended a total of seven times during his seventh grade year and had numerous meetings with the vice principal. A.B. was told that if he received one more suspension he would be expelled.

13. A.B. started meeting with a child psychologist and was diagnosed with attention-deficit hyperactivity disorder. A.B.'s school performance suffered and he was caught stealing money to purchase drug paraphernalia that he would then resell. A.B.'s substance use escalated and he began using harder drugs.

14. On September 28, 2018, A.B. was taken to the emergency room for the treatment of suicidal ideation. He met with a crisis worker and had a safety plan put into place. A.B. became increasingly isolated from his family and his parents had to lock up any alcohol. On a family vacation to Mexico, A.B. posted evidence online of him drinking one-hundred beers in ten days.

15. A.B. stopped any efforts to conceal his drug use and would fund it by stealing from local stores and then reselling what he took. Syringes were found in A.B.'s bedroom.

16. A.B.'s treatment team recommended that he receive inpatient care, and he was taken to Second Nature via a crisis transportation service.

**Second Nature**

17. A.B. was admitted to Second Nature on February 6, 2019.

18. In a letter dated October 25, 2019, Premera denied payment for A.B.'s treatment at Second Nature. The letter provided a list of claims and then stated that "this service is not covered under your plan."

19. On December 20, 2019, Oksana and Alexander submitted a level one appeal of the denial of payment for the denial of payment for A.B.'s treatment at Second Nature. They reminded Premera that they were entitled to certain protections under ERISA during the review process, including a full, fair, and thorough review of the denial conducted by appropriately qualified reviewers, which took into account all of the information they provided, which gave them the specific reasons for the adverse determination, referenced the specific plan provisions on which the determination was based, and which gave them a description of any additional material or information necessary to perfect the claim.

20. They wrote that Second Nature was licensed by the State of Utah and was nationally accredited, "which further demonstrates their commitment to excellence in health care." They questioned what basis Premera had to deny care based on these facts.

21. They requested that the next reviewer have experience working in the outdoor behavioral health field, and if not that they contact Dr. Michael Gass, an expert who could explain how wilderness care was clinical in nature, evidence-based, and proven to be effective.

22. Oksana and Alexander expressed concern that the denial was a violation of MHPAEA. They wrote that MHPAEA compelled insurance plans to ensure that coverage for mental healthcare was offered at parity with coverage for analogous medical or surgical services. They identified skilled nursing and subacute rehabilitation facilities as some of the medical or surgical analogues to the treatment A.B. received.

23. They alleged that Premera was applying limitations based on facility type and pointed out that while it had an exclusion for "outward bound, wilderness, camping or tall ship programs or activities," this exclusion was only mentioned once in the mental health benefits section of the insurance policy. They argued that as this exclusion applied exclusively to behavioral healthcare it was a violation of MHPAEA.

24. They asked if they were incorrect in their assertion that Premera furnish them with evidence that it imposed similar exclusions on medical or surgical providers. They also asked Premera to perform a MHPAEA compliance analysis and asked for the results of this analysis, along with the governing plan documents and the criteria used to evaluate the claim, together with the equivalent medical or surgical criteria for skilled nursing, rehabilitation, and hospice.

25. In a letter dated February 20, 2020, Premera upheld the denial of payment for A.B.'s treatment. The letter stated that wilderness programs were excluded from coverage and that:

> MHPAEA and its implementing regulations require that a plan that provides intermediate level of care for medical and surgical services also cover intermediate level of care for mental health services.[1] Premera does cover intermediate and residential care for mental health and for medical and surgical services and follows parity requirements. For example, Premera covers residential treatment centers for mental health services.
> What Premera does not cover is wilderness programs, regardless of the nature of the facility associated with the wilderness program. The plan bases decisions to cover services on a number of considerations, such as whether the service is generally accepted in the medical community as an effective medical treatment, the availability of scientific research addressing the service's medical efficacy, the existence and pervasiveness of state licensing standards for providers of the service, and whether there are generally accepted medical standards for evaluating medical necessity. These considerations apply both to services to treat mental health/ substance use conditions and to services to treat medical and surgical conditions.
>
> While the plan does not cover wilderness programs, it does allow coverage for medically necessary treatments, such as mental health counseling, from an eligible, licensed provider that may have been provided during the stay at Second Nature. You may submit claims for these services no later than 12 months from the date of service.

26. In addition, the letter included the opinion of an Allmed Healthcare reviewer which stated that treatment should be denied as wilderness programs were excluded from coverage. It also included copies of some of the criteria and documentation Plaintiffs requested but omitted others such as the materials Plaintiffs requested to evaluate the applicable Plan's MHPAEA compliance.

---

[1] This is a mischaracterization of the statute. MHPAEA does not require plans offering medical or surgical coverage to provide mental health coverage. However, if a plan does offer mental health coverage it must ensure that this coverage is provided at parity with the coverage offered for medical or surgical benefits in the same classification.

27. On March 21, 2020, Oksana and Alexander submitted a level two appeal of the denial of payment for A.B.'s treatment. They contended that Premera had failed to respect their rights under ERISA. They pointed out that Premera claimed to have reviewed A.B.'s medical records even though, because the medical necessity of treatment was never disputed, no medical records were ever submitted.

28. They wrote that Premera cited no evidence to support its denial and had failed to address their arguments. They also pointed out that the clinical criteria attached to the denial letter were for the wrong level of care and that Premera's reviewer appeared to have no experience or expertise with wilderness programs.

29. They reiterated that Second Nature was a licensed provider and offered services which were consistent with generally accepted standards of medical practice and satisfied the definition of medically necessary care in the insurance policy. They also contended that outdoor behavioral health programs were proven to be effective, had their own clinical criteria, and had been the subject of extensive peer reviews and trials. They included some of these materials with the appeal.

30. They noted that outdoor behavioral health programs were also recognized by the National Uniform Billing Committee and the American Hospital Association and had been assigned their own revenue codes for purposes of insurance billing for those services.

31. They continued to allege that the denial of payment was a violation of MHPAEA. They expressed their concern that Premera offered to cover aspects of the treatment such as A.B.'s "mental health counseling" but excluded coverage for other services such as room and board. They asked for evidence of Premera treating medical claims in this manner and again asked that a MHPAEA compliance analysis be performed.

32. In a letter dated July 17, 2020, Premera upheld the denial of payment for A.B.'s

treatment. The letter stated in pertinent part:

> Your request for coverage of the wilderness therapy remains denied. This decision
> was made based on the contract language which specifically excludes coverage on
> wilderness therapy. The documentation provided shows that this facility is
> licensed as a wilderness treatment program in the state of Utah; and the benefit
> contract clearly states that this type of facility is not covered under the plan. As
> well, the medical necessity criteria for treatment at a licensed Residential
> Treatment Center (RTC) requires meeting 1. severity of symptoms as outlined by
> Change Healthcare's InterQual guidelines for BH: Child and Adolescent, RTC,
> 2019 and our own Medical Policy 3.01.521 Psychiatric Evaluations in Inpatient
> and Residential Behavioral Health Treatment and meeting 2. intensity of services
> as outlined in both criteria above. The documentation provided at initial review
> and again at appeal level do not support either the severity of symptoms for this
> member at the level of RTC nor the intensity of service by this facility.

33. A.B. was readmitted to Second Nature from July 29, 2020, to October 16, 2020. As

before, Plaintiffs submitted claims for payment and Premera denied them based on an

exclusion for wilderness care.

34. Plaintiffs appealed this decision, noting that the insurance policy in effect at the time did

not exclude wilderness programs, and the denial was reversed. In a letter dated April 11,

2022, Premera stated that it would approve the treatment at Second Nature because:

> Your request for coverage for services performed by Second Nature Unitas [sic] is
> approved because we intended to include a specific statement in the plan benefit
> booklet that wilderness programs are not covered. We inadvertently[2] omitted that
> language in your Plan. Because of this oversight on our part, we will make an
> exception to the plan to allow for one-time coverage for this service.

---

[2] The 2020 policy does not contain an exclusion for wilderness, but the other exclusions in that
section remain. There is no indication as to whether this was an inadvertent exclusion as the
reviewer claims, or whether it was removed deliberately as the continued presence of the remaining
excluded items suggests.

35. Although it reversed the adverse decision for the second admission, Premera did not issue payment for the initial stay at Second Nature, even though the same facility was at issue, and both denials involved wilderness care.

**Catalyst**

36. A.B. was admitted to Catalyst on June 3, 2019, with Premera's approval.

37. In a letter dated July 5, 2019, Premera denied further payment for A.B.'s treatment at Catalyst from July 2, 2019, forward. The letter stated that treatment was denied because the treatment guidelines employed required that:

> Within the last week, one of these is true for you:
>
> - You have been having angry outbursts
> - You have hurt or tried to hurt others or have thoughts about killing others
> - You have hurt yourself or have thoughts about killing yourself
> - You have destroyed property, or you are having other very serious psychiatric symptoms.
>
> OR
>
> - Your symptoms have improved, discharge is planned within the next week, and either some treatment goals have not been met that will be met within the next week, or more work is needed with your family before you go home that will be done within the next week.
>
> AND
>
> - Within the last week, one of these is also true for you:
>   - You have very bad relationships with other people
>   - You are interacting with others in very angry or threatening ways
>   - You can't or won't follow instructions or ask for help to get your needs met
>
> OR
>
> - Your functioning has improved, discharge is planned within the next week, and passes are planned within the next week to help you get ready to go to another level of care.

38. In addition, Premera added the following as to why treatment was denied:

The information from your provider does not show any psychiatric evaluations, does not show daily clinical assessments by licensed providers, and does not show any discharge planning, The [sic] information also does not show individual or group or family therapy at least 3 times per week.

39. On December 20, 2019, Oksana and Alexander submitted a level one appeal of the denial of payment for A.B.'s treatment at Catalyst. They reminded the reviewer that Premera had an obligation under ERISA to act in their best interests. They requested a copy of the materials relevant to the denial including the criteria used and all documentation related to the determination, including case notes.

40. They wrote that Premera had based its decision to deny payment on information found in a proprietary internal policy, they reminded Premera that the language of their insurance policy superseded any proprietary guidelines. They also stated that according to the language of the insurance policy, Premera was supposed to take local standards of practice into account, but there was no indication that it had done so.

41. They wrote that Catalyst was duly licensed as a residential treatment center under Utah law and operated within the scope of that license. They argued that because the actual policy only required a provider to be licensed, Premera could not rely on requirements only present in other criteria as a basis to deny payment.

42. They also pointed out that Premera approved coverage for the initial stages of treatment at Catalyst. They argued that it was disingenuous for Premera to authorize payment and then introduce new requirements which had to be met when these prerequisites were not initially imposed in the initial decision to approve treatment.

43. Oksana and Alexander alleged that Premera imposed a set of significantly more stringent requirements for the days it denied than the requirements that were in effect during the timeframe it approved.

44. They wrote that by authorizing treatment for exactly thirty days, Premera appeared to have denied payment based on a preconceived notion of how long residential treatment was intended to last, instead of any other metrics like the terms of the insurance policy.

45. They included letters of medical necessity with the appeal. In the first of these letters, Jovana Radovic Wood, LMFT, stated in part:

> In September of 2018, [A.B.] also began to present with suicidal ideation, in addition to continuing to struggle with the aforementioned behaviors. In October of 2018, due to several different therapeutic strategies being tried and not successful (i.e. individual therapy, family therapy, school accommodations, psychoeducation regarding diagnosis and symptoms), parents agreed to have [A.B.] meet with a medication provider in an attempt to help improve the symptoms that were not changing through behavioral intervention means. Due to [A.B.]'s recent recreational drug use at the time, the medication provider did not believe that he was a good candidate for stimulant medications. At the time, [A.B.] could not fully guarantee that he will not continue recreational drug use. The medication provider prescribed Strattera 10mg daily, which [A.B.] used for several months. Though his symptoms of depression and suicidal ideation were improving, the behavioral and conduct issues persisted. Weekly, [A.B.] was continuing to report using drugs without the intention of stopping, as well as continuing to disobey both school and house rules.

> In February 2019, [A.B.]'s parents found needles in his room. [A.B.] continued to break every house rule, lie, steal, use drugs, and threaten running away from his family. He was unable to show any level of insight regarding his role in the problems he was facing, and continued to blame and externalize his challenges onto others. Due to having tried many different behavioral and medication strategies at that time, parents were feeling hopeless and without options, as well as scared after the most recent incident of finding the drug paraphernalia. At this time, it was decided that, in an effort to keep [A.B.] safe, he would need a much higher level of therapeutic care and intervention. Per my recommendation, [A.B.] was sent to Second Nature Wilderness Therapy in Utah. After spending several months at the above residential treatment facility, it was reported that [A.B.]'s challenges and symptoms continued to persist. Therein, further recommendation was given for [A.B.] to continue with an after-care program.

> Given the persistence of [A.B.]'s symptoms over the years, despite continued engagement in behavioral, medication, and most recently, residential therapy, a continued more intense level of treatment continues to be necessary. Ongoing aftercare treatment would be necessary in an effort to achieve significant and lasting improvement of [A.B.]'s conditions.

46. Devan Glissmeyer, Ph.D. wrote in part in A.B.'s Second Nature discharge summary:

> [A.B.] was discharged from Second Nature on 6/3/2019. Aftercare options were discussed with his parents. At times [A.B.] seemed motivated to make progress at Second Nature, and enjoyed the relative stability of the wilderness setting as a chance to stabilize and experience some success. However, there remains significant concern regarding his risk for relapsing in the areas of opposition, anger, depressive symptoms and substance abuse if he were to return to his home environment after completing our program. If any long-term gains are to be made, he must be in a residential or therapeutic boarding school setting after Second Nature so that he can practice and internalize the tools he learned at Second Nature. Returning to his home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to his previous level of functioning. [A.B.] remains highly susceptible to external pressures and has not yet internalized the ability to implement the coping strategies he has learned at Second Nature without a structured setting. [A.B.] transitioned to Catalyst Residential Treatment Center.

47. Oksana and Alexander wrote that it was the clinical opinion of the medical professionals who had worked with A.B. on a firsthand basis and had actively witnessed the deterioration and treatment of his conditions, that he required the residential treatment he was receiving at Catalyst.

48. In response to this appeal, Premera sent Plaintiffs a variety of denial materials, including a letter dated January 14, 2020, which stated in part:

> We found that the denial of Continued Mental Health Residential Treatment after July 2, 2019 as not medically necessary is based on accepted medical standards. We made this decision based on the terms from the Summary Plan Description, which is attached.

> You were not wanting to harm yourself or others. You were not hearing or seeing things that were not there. You were not so severely disturbed in thinking to require 24-hour nursing supervision. You continued to make progress in your treatment that could have allowed you to be treated in a lower level of care, such as partial hospitalization.

49. The denial materials also included the opinions of an external reviewer which stated in part:

> The patient is diagnosed with major depressive disorder, recurrent, severe without psychotic features. As of 7/2/19, the patient was not reported to be suicidal,

homicidal, or gravely impaired for self-care. There was no report of self harm. The patient did not report any auditory or visual hallucinations. The patient did not report any auditory or visual hallucinations. The patient was compliant with treatment and was attending individual and family therapy sessions. He had family support. The patient did not have any severe symptoms that required 24-hour nursing supervision. From the clinical evidence, the patient could have been treated in a lower level of care, such as partial hospitalization. Therefore, the request for continued residential treatment from 7/2/19 to discharge is not medically necessary.

50. On February 26, 2020, Oksana and Alexander submitted an additional appeal of the denial of payment for A.B.'s treatment at Catalyst. They contended that Premera appeared to have altered its justification for the denial to focus solely on medical necessity. They continued to assert that A.B.'s treatment was medically necessary.

51. They argued that Premera had failed to respect their rights under ERISA. They wrote that following the submission of their level one appeal they received a confirmation letter that the appeal had been received. They then contacted Premera on January 27, 2019, and were told that a deadline for additional information had been missed on January 24, 2020.

52. They wrote that they had never received any request for additional information. They were told that the timeframe to review the appeal had expired, but they could still have the appeal reviewed by an external agency.

53. They wrote that this contradicted the terms of the insurance policy which required that two levels of appeal be conducted before an external review agency could be consulted. They stated that as they had been given conflicting information, they intended this appeal to act as an internal or external appeal request according to whichever of these was applicable, with a preference for review by an external review agency.

54. They alleged that Premera's denial was a violation of generally accepted standards of medical practice and, among other things, relied on acute level criteria to assess the

medical necessity of a sub-acute level of care and that Premera pushed individuals into a lower level of care regardless of whether it would be effective, prudent, or safe to do so.

55. They pointed out that Premera's denials were based on factors such as a lack of suicidal/homicidal behaviors, self-harm, and auditory and visual hallucinations. They argued that many of these items were indistinguishable from Premera's criteria for acute inpatient hospitalization. They wrote that residential treatment centers were neither intended to treat nor equipped to handle individuals suffering from these types of symptoms.

56. They contended that Premera had not adequately addressed A.B.'s dual diagnosis of mental health and substance use conditions. They shared a report from the U.S. Surgeon General titled *Facing Addiction in America* which discussed the significance of substance disorders in adolescents.

57. They pointed out that A.B. struggled from conditions such as oppositional defiant disorder and argued that he was at significant risk of relapse without appropriate treatment. They wrote that just because A.B. was compliant with treatment while in a controlled residential treatment environment there was no guarantee that he would continue to be compliant in an outpatient setting, especially given A.B.'s history of dysfunctional family dynamics and aggressive behaviors.

58. They continued to allege that the denial was a violation of MHPAEA and wrote that to lawfully require an individual receiving sub-acute residential treatment to exhibit acute level symptoms Premera would need to require the same of sub-acute medical or surgical care like skilled nursing. They argued that Premera did not do so.

59. They stated that requiring acute symptoms for skilled nursing patients would be akin to requiring an individual be actively experiencing a heart attack to have their skilled

nursing stay approved, or requiring a person to be actively harming themselves in order

to receive treatment in a rehabilitation facility and that Premera's intermediate level

medical and surgical guidelines did not contain requirements such as these.

60. They again asked that a MHPAEA analysis be performed to assess the Plan's compliance

with the statute.

61. In a letter dated April 3, 2020, external review agency AllMed upheld the denial of

payment for A.B.'s treatment. The reviewer wrote in pertinent part:

> After careful review of the records submitted, the claimant appears to have history of alcohol and substance abuse, parent-child relationship issues, and depression requiring admission at Catalyst Residential Treatment Center on 06/03/2019. However, during the period in question since 07/02/2019, there is no documentation that the claimant demonstrated any disorganized behavioral problems requiring 24 hours [sic] supervision, no homicidal or suicidal ideation, no hallucinations, no psychotic behavior, and no intensions [sic] of harm to others or himself. It appears that the claimant's condition could have been managed appropriately at a lower level of care such as Intensive Outpatient Program (IOP), aggressive medication management, and group therapy for adolescents as outpatient.
>
> Therefore, based on the referenced evidence-based medical literature, InterQual Guidelines, as well as the clinical documentation stated above, it is the professional opinion of this reviewer that the request for coverage of continued Mental Health Residential Treatment from 07/02/2019 through his future date of discharge is not medically necessary and appropriate.

62. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan

and ERISA.

63. The denial of benefits for A.B.'s treatment was a breach of contract and caused Oksana

and Alexander to incur medical expenses that should have been paid by the Plan in an

amount totaling over $150,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

64. ERISA imposes higher-than-marketplace quality standards on insurers and plan

administrators. It sets forth a special standard of care upon plan fiduciaries such as Premera, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

65. Premera and the applicable Plan failed to provide coverage for A.B.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

66. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

67. The denial letters produced by Premera do little to elucidate whether Premera conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Premera failed to substantively respond to the issues presented in Oksana and Alexander's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

68. In addition, the factors cited by Premera as justifications to deny payment for Catalyst, such as a lack of visual and auditory hallucinations, were also not present during the portion of the treatment that Premera approved. This lends credence to Plaintiffs' assertion that after a 30 day period elapsed, Premera evaluated the treatment using a much more restrictive methodology.

69. Premera and the agents of the Plan breached their fiduciary duties to A.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act

solely in A.B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.B.'s claims.

70. The actions of Premera and the applicable Plan in failing to provide coverage for A.B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

71. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under both causes of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

72. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Premera's fiduciary duties.

73. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

74. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

75. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

76. The medical necessity criteria used by Premera for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the applicable Plan applies to analogous intermediate levels of medical or surgical benefits.

77. Comparable benefits offered by the applicable Plan for medical/surgical treatment analogous to the benefits the applicable Plan excluded for A.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

78. For none of these types of treatment does Premera exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

79. When Premera and the applicable Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the applicable Plan based on generally accepted standards of medical practice. Premera and the applicable Plan evaluated A.B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical

practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

80. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Premera's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.B. received.

81. Premera's improper use of acute inpatient medical necessity criteria is revealed in the statements in Premera's denial letters such as "You were not wanting to harm yourself or others. You were not hearing or seeing things that were not there. You were not so severely disturbed in thinking to require 24-hour nursing supervision."

82. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.B. received. The applicable Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

83. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

84. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical

claims.

85. In addition, Defendants did not produce, nor does the medical record contain, examples of A.B. acting with acute symptoms such as suicidal or homicidal intent during the timeframe Premera approved treatment. This absence of acute level symptoms was only presented as an issue once Premera elected to deny payment.

86. Premera denied A.B.'s outdoor behavioral health treatment in large part on the basis that it was an excluded benefit. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

87. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that Premera categorically excludes from coverage.

88. Premera excised the exclusion for wilderness care in its 2020 policy. The reviewer then covered this portion of the treatment. This acceptance of A.B.'s second admission to Second Nature is an admission that the only justification for denying payment for A.B.'s treatment was this wilderness exclusion.

89. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the applicable Plan and the medical necessity criteria utilized by the Plan and Premera, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

90. Premera and the applicable Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any

substantive capacity the Plaintiffs' allegations that Premera and the Plan were not in compliance with MHPAEA.

91. In fact, despite Oksana and Alexander's request that Premera and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Premera and the Plan have not provided Oksana and Alexander with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Premera and the applicable Plan have not provided Oksana and Alexander with any information about the results of this analysis.

92. The violations of MHPAEA by Premera and the applicable Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the applicable Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the applicable Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f)  An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g)  An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h)  An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

93.  In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.  Judgment in the total amount that is owed for A.B.'s medically necessary treatment at Second Nature and Catalyst under the terms of the applicable Plan, plus pre and post-judgment interest to the date of payment;

2.  Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.  Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.  For such further relief as the Court deems just and proper.

DATED this 25th day of October 2022.

By     s/ John Walker Wood  #39120
         John Walker Wood
         Attorney for Plaintiffs
         The Wood Law, PLLC
         701 5th Ave, Ste 4200
         Seattle, WA 98104
         Tel.: (206) 650-0765
         Fax: (206) 577-5380
         john@woodfirm.com

County of Plaintiffs' Residence:
King County, Washington