1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

10   OKSANA B., et al.,                                CASE NO. C22-1517 MJP

11                        Plaintiffs,                  ORDER ON CROSS-MOTIONS

12          v.

13   PREMERA BLUE CROSS, et al.,

14                        Defendants.

15

16          This matter comes before the Court on Plaintiffs' Rule 52 Motion for Judgment on the

17   Record (Dkt. No. 22) and Defendants' Motion for Summary Judgment (Dkt. No. 23). Having

18   reviewed the Motions, the Responses (Dkt. Nos. 27, 28), the Replies (Dkt. Nos. 32, 33), and all

19   supporting materials, and having held oral argument on December 11, 2023, the Court GRANTS

20   in part and DENIES in part Plaintiffs' Motion and DENIES Defendants' Motion. The Court

21   REMANDS the claims to Defendants to award benefits consistent with this Order.

22
23
24

# BACKGROUND

Plaintiffs A.B. and his parents, Oksana and Alexander, bring suit against Defendants for denying claims for A.B.'s stay at two mental health care facilities in 2019 and 2020. Defendants are Premera Blue Cross, The Tableau Software, Inc. Employee Benefit Plan,[1] and Salesforce.com Health and Welfare Plan ("Defendants"). Premera is the administrator of the Tableau (now Salesforce) Plan ("Plan"), and Alexander is a Tableau employee entitled to benefits under the Plan for himself and his family.

The Court first reviews the Plan terms, A.B.'s mental health and addiction history, his stays at the two facilities, and Premera's denial of coverage for both stays.

## A.    Plan Language

The Plan covers "mental health services to manage or lessen the effects of a psychiatric condition." (AR 4155.)[2] The services must be medically necessary, meaning that:

> a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms and that are:
>
> - In accordance with generally accepted standards of medical practice;
>
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
>
> - Not primarily for the convenience of the patient, physician or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

(AR 2191.)

---

[1] Alexander's employer is Tableau, and he has health insurance benefits through the Tableau Plan.

[2] The Court refers to the administrative record as "AR" and omits the zeroes in the page numbering. The sealed administrative record is found at Dkt. Nos. 30 & 31.

The Plan gives Premera "discretionary authority to determine eligibility for benefits and to construe the terms used in this plan to the extent stated in our administrative services contract with the Group." (AR 2111.) And while Premera is required to follow the Plan's terms, it also developed and followed its own guidelines for residential mental health care. (See AR 2197-2202.) And it used the InterQual guidelines developed by McKesson to evaluate medical necessity. (See, e.g., AR 2226-30.)

The Plan includes two exclusions that are relevant to this matter. First, within its mental health benefits section, the Plan states that it "doesn't cover . . . Outward bound, wilderness, camping or tall ship programs or activities." (AR 4156.) The Plan does not define any of these terms. Second, the Plan includes a general exclusion for "recreational, camp and activity programs" stating that they are "not medically necessary." (AR 4160.) The Plan defines recreational, camp and activity-based programs to "include":

- Gym, swim and other sports programs, camps and training

- Creative art, play and sensory movement and dance therapy

- Recreational programs and camps

- Boot camp programs

- Equine programs and other animal-assisted programs and camps

- Exercise and maintenance-level programs

(Id.)

Lastly, the Court notes that the Plan defines "provider" broadly to include "[a] health care practitioner or facility that is in a licensed or certified provider category regulated by the state in which the practitioner or facility provides care, and that practices within the scope of such licensure or certification." (AR 2193.)

**B.      A.B.'s Health History**

A.B. was born in 2004 and by 2019 he had developed a significant history of drug and alcohol abuse, as well as depression, parent-child relationship problems, and an oppositional defiant disorder. (See AR 262.) Jovana Radovic Wood, a licensed marriage and family therapist (LMFT), began treating A.B. in 2017, and found he met the criteria for Attention Deficit Hyperactivity Disorder. (AR 291.) The Parents reported to Wood A.B.'s oppositional and defiant behavior involving lying, stealing, and both using and dealing drugs, which Wood believed could meet the criteria for Opposition Defiant Disorder. (Id.) Over the course of 2017 and 2018, A.B.'s symptoms escalated, and he confirmed both his drug use and drug dealing, as well as his refusal to change his oppositional and defiant behavior. (Id.) By September 2018, A.B. presented with depression and suicidal ideation and the Parents agreed to try medication to improve behavior given the failure of individual and family therapy, school accommodations, and psychoeducation about diagnosis and symptoms. (AR 291-92.) Although A.B. used Straterra (10mg/daily) for several months help improve symptoms of depression and suicidal ideation, he continued to report unabated drug and alcohol use and oppositional behavior. (AR 292.) In February 2019, his parents found needles in his room suggestive of increased drug use and he was otherwise unable to follow house rules. (AR 292.) The frequency and amount of drug use was substantial, including 10 drinks a day two times a week, hallucinogens once over two weeks, daily use of marijuana, and occasional use of designer drugs. (AR 780.)

**C.      Stay at Second Nature**

To keep A.B. safe, Wood recommended that A.B. attend Second Nature Wilderness Therapy in Utah, where he would receive intensive mental health therapy outside of his home setting. (AR 292; AR 4772.) On February 6, 2019, A.B. was picked up by crisis interventionists

1  and taken to Second Nature where he stayed for four months (until June 3, 2019). (AR 4772; AR

2  262.) During this stay, Second Nature was licensed by Utah's Department of Human Services as

3  an outdoor youth treatment provider for up to 150 youth clients aged 13 to 17. (AR 1069.)

4  Materials submitted by Defendants with their Motion include website printouts taken from

5  Second Nature's website in 2023, which describe its program as "utiliz[ing] a clinically-

6  sophisticated model (which includes individual and group therapy), ceremony, metaphor, and

7  affinity for the healing power of nature, to promote resiliency, healthy choices, and real change."

8  (Declaration of Gwendolyn Payton, Ex. 1 at 3 (Dkt. No. 24).) These materials report that

9  "Second Nature is a full service intensive therapeutic experience" which employes licensed and

10  experienced therapists and psychologist to support "areas such as individual, group, and family

11  therapy, medical, professional field guides, mindfulness and yoga training, family intensives,

12  psychiatry, safety, education, logistics, gear, nutrition, transportation, communications, and case

13  management." (Id., Ex. 2 at 2.)

14      Shortly after A.B's arrival at Second Nature, Devan Glissmeyer, Ph.D., prepared a

15  Master Treatment Plan, which included the following DSM 5 "Diagnostic Impressions": "Parent-

16  Child Relational Problem"; "Oppositional Defiant Disorder, Moderate to Severe"; "Major

17  Depressive Disorder, Recurrent Episode, Moderate"; "Cannabis Use Disorder, Severe, in Early

18  Remission, In Controlled Environment"; and "Alcohol Use Disorder, Moderate, In Early

19  Remission, In Controlled Environment." (AR 265-71.) Glissmeyer outlined treatment areas, both

20  short and long-term goals, and interventions for each of these diagnoses. (Id.) The record shows

21  that Glissmeyer and A.B. met weekly for hour-long therapy sessions. (AR 273-286.)

22      At the end of A.B.'s stay, Glissmeyer provided treatment and discharge summary notes.

23  (AR 262.) Glissmeyer noted that although A.B. made some progress, he "remained resistant

24

throughout his stay" and "he remained resigned to blaming his parents and maintained an overall below average level of engagement and success in the program." (AR 263.) Glissmeyer noted A.B.'s continued struggles with defiant conduct, depression, and a ruptured relationship with his parents. (AR 263.) And while A.B. had been sober during his stay at Second Nature and expressed a desire to abstain, he "continues to struggle with the motivation to" stay sober and remained "at increased risk of relapse without continued intervention and support." (AR 263.) Glissmeyer recommended that A.B. leave Second Nature and immediately begin receiving treatment at Catalyst Residential Treatment Center to solidify gains and avoid a relapse. (AR 264.) Glissmeyer wrote:

> [T]here remains significant concern . . . regarding his risk for relapsing in the areas of opposition, anger, depressive symptoms, and substance abuse if he were to return to his home environment after completing our program. If any long-term gains are to be made, he must be in a residential or therapeutic boarding school setting after Second Nature so that he can practice and internalize the tools he learned at Second Nature. Returning to his home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to his previous level of functioning. [A.B.] remains highly susceptible to external pressures and has not yet internalized the ability to implement the coping strategies he has learned at Second Nature without a structure setting. [A.B.] transitioned to Catalyst Residential Treatment Center.

(AR 264.)

**D.    A.B.'s Stay at Catalyst**

A.B. received mental health and substance abuse treatment at Catalyst, a licensed residential treatment center in Utah, from June 3, 2019 until a date in 2020 that the Parties agree is not in the administrative record. Premera authorized his admission to Catalyst through July 2, 2019. (AR 4768.) When A.B. was admitted, Karen Miller, a registered nurse, prepared a nursing assessment. (AR 779-89.) Miller noted A.B. had last used alcohol and recreational drugs in February 2019 (before his Second Nature stay), and that his use was truly substantial and daily. (AR 780.) She noted he had cravings (AR 781), and that he was candid, courteous, and

cooperative (AR 787). Seven days later, Meghan Kunz, a psychiatric mental health nurse

practitioner (PMHNP), prepared a psychiatric medication evaluation. (AR 790-93.) Kunz

provided a summary of A.B.'s existing and past mental health history and drug/alcohol use.

Kunz provided a diagnosis of anxiety disorder, depressive disorder, ADHD "combined type"

disorder, and cannabis use disorder. (AR 793.) Kunz did not recommend medication, but instead

recommended individual, family, group, and recreational therapy, noting "[t]he Academic and

Substance use treatment that is offered here at this program [at Catalyst] will benefit [A.B.]

greatly." (AR 793.) She noted that "Catalyst will also allow [A.B.] to work on his emotional

regulation, coping skills, cognitive and behavioral issues, and solution focused motives as well as

other treatment approaches." (AR 793.)

　　　　While at Catalyst, A.B. received weekly hour-long family therapy sessions, weekly hour-

long individual therapy sessions, and group therapy 3-4 times per week. (AR 470-778.) Progress

notes from his first month confirm that he posed no risk of self-harm or suicide risk and had

shown "appropriate" affect, thought content, and mood, and "focused" concentration. (AR 725-

778.) Overall, the treatment notes show limited progress in therapy. (See id.) At the 30th day of

his stay, A.B.'s treatment provider noted he "had a little emotional breakdown in session this

week" and was "not doing a lot of anything at Catalyst right now." (AR 727.) A "Master

Treatment Plan" developed on July 8, 2019 lists five DSM-5 diagnoses: (1) major depressive

disorder, recurrent episode, moderate; (2) oppositional defiant disorder; (3) cannabis use

disorder, moderate; (4) alcohol use disorder, moderate; and (5) parent-child relational problem.

(AR 706-14.) The Master Treatment Plan notes current evidence supporting each of the DSM5

diagnoses and objectives in treating each disorder. (Id.)

Although the record is not clear when A.B. left Catalyst, he resided there at least into February 2020. Evidence of his departure is not in the administrative record because of the timing of the appeals of Premera's denial of coverage.

**E.     Premera's Denial of Coverage for A.B.'s Stay at Second Nature**

Premera denied the Parents' request to cover A.B.'s four-month stay at Second Nature, stating that "[a] Wilderness Program" is "not covered under your plan." (AR 1052.) The Parents appealed in what is called a "Level One Appeal." In it, they argued: (1) Premera failed to cite a specific plan provision that excluded the claim; (2) Second Nature was a provider under the plain terms of the plan because it provides behavioral health treatment for adolescents and is licensed to do so in Utah; (3) Premera's denial constituted a violation of the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act (the "Parity Act"), 29 U.S.C. § 1185a. (AR 4288-94.) Although the Parents faulted Premera for not citing the specific plan provision, the Parents were able to identify the correct plan exclusion in their letter. (See AR 4293 (noting that "[t]he singular mention of programs like Second Nature was contained in our plan's mental health benefits section, which states that 'outward bound, wilderness, camping or tall ship programs or activities,' are excluded from coverage.").)

Premera denied the Level One Appeal, noting that "[a]ccording to the terms of your health plan, wilderness programs are an exclusion from coverage [and a]s a result, the treatment you received at Second Nature Wilderness Program is denied coverage." (AR 4145.) Although Premera did not cite the specific page number in the Plan, it quoted the Plan language that it applied to deny coverage. (AR 4147.) Premera also explained that it complied with the Parity Act by "cover[ing] intermediate and residential care for mental health and for medical and surgical services and follows parity requirements." (AR 4145.) It further stated that "[w]hat

1    Premera does not cover is wilderness programs, regardless of the nature of the facility associated

2    with the wilderness program." (Id.) Premera further noted that "[w]hile the plan does not cover

3    wilderness programs, it does allow coverage for medically necessary treatments, such as mental

4    health counseling, from an eligible licensed provider that may have been provided during the

5    stay at Second Nature [and it informed Parents they could] . . . submit claims for these services

6    no later than 12 months from the date of service." (Id.) Premera also included a review from a

7    doctor retained by AllMed, who opined that "[a]ccording to the terms of your health plan,

8    wilderness programs are an exclusion from coverage . . . [and a]s a result, the treatment you

9    received at Second Nature is denied coverage." (AR 4151.) The medical reviewer provided no

10   assessment as to the medical necessity of the stay.

11        The Parents made a Level Two Appeal, challenging the medical necessity determination,

12   asserting the appropriateness of the therapy from a licensed provider, and again maintaining

13   Premera violated the Parity Act. (AR 2868-86.) The Parents also wrote that "Premera's offer to

14   pay for all of [A.B.'s] medically necessary treatment at Second Nature with the exception of his

15   room and board is insulting" and they did not submit any such request. (AR 2884.) Premera

16   denied the appeal "based on the contract language which specifically excludes coverage on

17   wilderness therapy." (AR 4276.) As to medical necessity, Premera noted that "[t]he

18   documentation provided at initial review and again at appeal level do not support either the

19   severity of symptoms for this member at the level of RTC [residential treatment center] nor [sic]

20   the intensity of services by this facility." (Id.) The Parents were afforded a chance to ask for an

21   independent medical review, but declined any further administrative action.

22

23

24

**F.    Premera's Denial of Coverage for A.B.s Stay at Catalyst After the First 30 Days**

After covering the first thirty days of A.B.'s stay at Catalyst, Premera denied any continuing care he received after July 2, 2019. (AR 4021-22.) Premera reasoned that after reviewing unspecific "medical records" from Catalyst, A.B.'s continued care was not medically necessary and "the service does not meet guidelines for continued inpatient coverage after July 2, 2019." (AR 4021.) Premera identified treatment guidelines that match the InterQual guidelines, and concluded that A.B. had either not shown certain signs of distress or that his symptoms improved. (AR 4021-22.) But the letter does not say specifically what factors or conditions were present or absent. The letter also states that A.B. had not received evaluations and therapy consistent with the "treatment guidelines we use" that required weekly psychiatric evaluations, daily clinical assessments by licensed providers, discharge planning, and individual, group, or family therapy at least 3 times per week. (AR 4022.)

The Parents submitted a Level One Appeal. They argued that Catalyst met the Plan's definition of a provider, and that Premera's internal guidelines were inconsistent and should not apply. (See AR 4767-68.) As the Parents noted pointedly: "[a]s we stated earlier in this appeal, having once acknowledged that Catalyst met all of our plan's requirements for coverage, how can you suddenly claim that Catalyst does not meet intensity of service requirements?" (AR 4768.) The Parents further took issue with Premera's medical-necessity-related denial, highlighting the fact that the initial stay was deemed medically necessary and the absence of any signs of improvement. (AR 4768-75.) The Parents noted A.B.'s educational, social, and medical history, and provided the recommendations of his two treating providers, Wood and Glissmeyer, that he remain at Catalyst for sufficient time to treat his underlying conditions and avoid relapse. Glissmeyer's recommendation was prepared at the end of A.B.'s stay at Second Nature, while

1 | Wood prepared hers in September 2019. And although Wood had not seen A.B. since early

2 | 2019, she provided her recommendation based on her years of treating A.B. and her

3 | understanding of Glissmeyer's recommendation from Second Nature. (AR 291-92.) Both

4 | providers recommended continued residential treatment. The Parents asked Premera to

5 | specifically explain why it disregarded the opinions of both Wood and Glissmeyer. (AR 4775.)

6 | And, lastly, the Parents argued that Premera's denial violated the Parity Act.

7 | Premera denied the appeal, finding "Continued Mental Health Residential Treatment

8 | after July 2, 2019 [w]as not medically necessary." (AR 2080.) Premera reasoned that based on

9 | the Plan terms and accepted medical standards, A.B. "continued to make progress in [his]

10 | treatment that could have allowed [him] to be treated in a lower level of care, such as partial

11 | hospitalization." (AR 2080.) In support of this conclusion Premera noted A.B. had not wanted to

12 | harm himself or others, was not hallucinating and was "not so severely disturbed in thinking to

13 | require 24-hour nursing supervision." (AR 2080.) Premera's denial did not include any statement

14 | concerning the lack of a psychiatric evaluation, daily clinical assessments, thrice weekly therapy,

15 | or a discharge plan—i.e., the facility-based reasons for denial expressed in the initial denial. In

16 | addition to its written letter denial, Premera also provided a medical opinion it obtained from

17 | Ashraf Ali, M.D., a board certified physician in general psychiatry and child and adolescent

18 | psychiatry. (AR 2105-08.) Dr. Ali reviewed the Parents' appeal, the denial letter, journal articles,

19 | clinical notes, a discharge summary, lab results, and plan language. (AR 2105.) Dr. Ali found the

20 | continued stay at Catalyst was not medically necessary because A.B. was "not reported to be

21 | suicidal, homicidal, or gravely impaired for self-care" and he was not reporting of harm to

22 | himself or others, or any hallucinations. (AR 2106-08.) Dr. Ali noted as significant that A.B. had

23 | been compliant with treatment, attended therapy, and had family support. (AR 2108.) He further

24 |

1   noted the "patient did not have any severe symptoms that required 24-hour nursing supervision."

2   (Id.) From this "clinical evidence, [he concluded] the patient could have been treated in a lower

3   level of care, such as partial hospitalization" and that "continued residential treatment from

4   7/2/19 to discharge is not medically necessary." (Id.)

5          The Parents submitted a Level Two Appeal in which they challenged Premera's use of

6   the InterQual guidelines to made medical necessity findings on the theory they require too great

7   a level of severity to gain access to medically-necessary care. (AR 10-22.) They further

8   complained the reviews lacked any discussion of A.B.'s significant history and the opinions of

9   his treating providers. (Id.) Additionally, the Parents noted that Premera abandoned its facility-

10  based reasons to denying coverage: "To our knowledge, it appears that Premera has decided to

11  uphold the medical necessity denial but overturn the intensity of service denial, as this issued

12  was not raised in Premera's response to our level one appeal." (AR 11.) The Parents argued the

13  denial violated the Parity Act by requiring acute symptoms to get residential mental treatment,

14  while demanding far less for the medical/surgical analog at a skilled nursing facility. The Parents

15  asked for review from an independent review organization (IRO).

16         Premera requested and obtained an IRO from MET Healthcare Solutions, which found

17  A.B.'s lack of acute symptoms meant that his needs could have been managed in an intensive

18  outpatient program, through aggressive medication management, and through group therapy for

19  adolescents as an outpatient. (AR 2305-06.) The IRO reviewed the recommendations of Wood

20  and Glissmeyer, as well as a swath of treating notes from Catalyst. The IRO noted "the claimant

21  appears to have a history of alcohol and substance abuse, parent-child issues, and depression

22  requiring admission at Catalyst Residential Treatment Center on 06/03/2019." (AR 2305.)

23  Despite finding the admission medically necessary, the IRO found that continued care was not

24

necessary. The IRO did not explain its reasoning or why the recommendation from Wood or Glissmeyer should be overlooked. Instead, the IRO stated:

> during the period in question since 07/02/2019, there is no documentation that the claimant demonstrated any disorganized behavioral programs requiring 24 hours supervision, no homicidal or suicidal ideation, no hallucinations, no psychotic behavior, and no intensions of harm to others or himself. It appears that the claimant's condition could have been managed appropriately at a lower level of care such as Intensive Outpatient Program (IOP), aggressive medication management, and group therapy for adolescents as outpatients.

(AR 2305-06.)

## G.     Lawsuit

After Premera denied both claims, the Parents filed this action. The Parents bring two claims: (1) that the denial of benefits for A.B.'s stays at both Second Nature and Catalyst violated ERISA, 29 U.S.C § 1132(a)(1)(B) (Compl. ¶¶ 64-71); and (2) that the denial of benefits for A.B.'s stays at Second Nature and Catalyst violated the Parity Act (id. ¶¶ 72-92). The Parties have cross-moved for a determination on the merits of both claims.

## ANALYSIS

## A.     Standards of Review

The Parties agree that Plaintiffs' claims under ERISA § 1132(a)(1)(B) are subject to an abuse of discretion standard because Premera is given discretionary authority to determine benefits under the Plan. (See Defs. MSJ at 12 (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)); Pls. Mot. at 20.) Under this standard, the Court may find an abuse of discretion if the plan administrator "(1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan, 410 F.3d 1173, 1178 (9th Cir. 2005). "'A finding is clearly erroneous when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and

firm conviction that a mistake has been committed.'" Id. (quoting Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 622 (1993)). "We will uphold the decision of an ERISA plan administrator if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." Id. (quotation omitted).

The Parties also agree that the Court must review the Parity Act claims de novo. That is because a Parity Act violation involves a substantive ERISA violation instead of a violation of the Plan's terms, meaning that district courts owe no deference to the plan administrator's interpretation. Kevin D. v. Blue Cross & Blue Shield of S.C., 545 F. Supp. 3d 587, 613 (M.D. Tenn. 2021). The Court' s review is therefore de novo, and Plaintiffs bears the burden of proof. Stone v. UnitedHealthcare Ins. Co., 979 F.3d 770, 774 (9th Cir. 2020).

**B.     ERISA claims**

As to Plaintiffs' ERISA claims, the Court analyzes separately the denial of coverage for A.B.'s stay at Second Nature and at Catalyst. The Court finds that Premera abused its discretion in denying both claims for benefits.

### 1.      Premera's Improper Denial of Coverage for A.B.'s Stay at Second Nature

The Court agrees with Plaintiffs that Premera abused its discretion in finding that the Plan excluded coverage for A.B.'s treatment at Second Nature.

In denying the claim, Premera concluded that Second Nature was a "wilderness program" (AR 1052, 4145) and fell within the Plan's exclusion for "Outward bound, wilderness, camping or tall ship programs or activities" (AR 4156; see id. 1052, 4145, 4276-84, 4621-26). But in each of its three denial letters, Premera failed to provide any reasoned explanation as to why the Plan's exclusion should be read so expansively or applied to the specific mental health treatment provided by Second Nature. In its first denial, Premera stated, in full, that it had "reviewed the terms of [Plaintiffs'] healthcare coverage and found that [a Wilderness Program] was not

1  covered under your plan." (AR 1052.) The second denial provided little more. Premera found

2  "[t]he information we have received shows that this program is a wilderness program" and that

3  "[a]ccording to the terms of your health plan, wilderness programs are an exclusion from

4  coverage." (AR 4154.) Premera explained that "[w]hat Premera does not cover is wilderness

5  programs, regardless of the nature of the facility associated with the wilderness program." (Id.)

6  While Premera suggested its opinion was based on variety of "considerations," it did not explain

7  what those considerations were or how they were applied. (Id.) And in the third denial, Premera

8  explained that the "request for coverage of the wilderness therapy remains denied . . . based on

9  the contract language which specifically excludes coverage on [sic] wilderness therapy." (AR

10  4276.) Premera explained "[t]he documentation provided shows that this facility is licensed as a

11  wilderness treatment program in the state of Utah; and the benefit contract clearly states that this

12  type of facility is not covered under the plan." (Id.)

13       Through all three denials, Premera failed to provide a reasonable interpretation or

14  application of the Plan's exclusion for "wilderness . . . program or activities" to Second Nature.

15  By its express terms, the Plan's exclusion applies only to "Outward bound, wilderness, camping

16  or tall ship programs or activities" without any indication that this includes mental healthcare

17  facilities that provide care in an outdoor or wilderness setting. (AR 4156.) Premera presented no

18  analysis as to why a licensed mental healthcare provider who treats patients in an outdoor setting

19  falls within this exclusion. Nor did Premera provide any comparison between the services

20  Second Nature provided and those provided by outward bound, tall ships, wilderness, or camping

21  programs. This was despite Premera's recognition that Second Nature is a "facility . . . licensed

22  as a wilderness treatment program in the state of Utah." (AR 4276.) Indeed, the materials

23  Premera submitted with its Motion for Summary Judgment further confirm that Second Nature

24

1    was not merely a provider of outdoor recreation: "Second Nature is a full service intensive

2    therapeutic experience" which employs licensed and experienced therapists and psychologist to

3    support "areas such as individual, group, and family therapy, medical, professional field guides,

4    mindfulness and yoga training, family intensives, psychiatry, safety, education, logistics, gear,

5    nutrition, transportation, communications, and case management." (Payton Decl. Ex. 2 at 2.) And

6    the treatment notes for A.B. show that he received substantial therapeutic support while at

7    Second Nature. Premera's denial fails to provide any reasoned explanation for its self-serving

8    interpretation of the Plan's exclusion or its application to Second Nature. As such, Premera

9    abused its discretion. See Boyd, 410 F.3d at 1178.

10          Without expressly stating so, Premera appears to have construed the Plan's exclusion to

11   encompass any mental healthcare provider who serves patients in an outdoor setting because the

12   exclusion appears in the mental healthcare portion of the Plan. Premera provides no reason why

13   the Plan's plain language should be rewritten and interpreted so expansively merely because of

14   this fact. Instead, Premera's final denial shows that it simply rewrote the Plan's terms,

15   incorrectly stating that "the contract language . . . specifically excludes coverage on wilderness

16   therapy." (AR 4276.) The Plan contains no such "specific[]" language. The exclusion speaks

17   only to recreational activities without any linkage to mental healthcare providers—which

18   Premera concedes includes Second Nature. The mere placement of the list of recreational

19   activities in the Plan's mental healthcare section does not justify Premera's expansive and

20   unexplained rewrite of the exclusion to reach mental healthcare provided in an outdoor setting.

21   Had the Plan intended to exclude mental healthcare provided in an outdoor setting it could have,

22   but did not say so. Premera's unexplained revision of the Plan's terms that conflict with the

23

24

1    narrow exclusionary language demonstrates how Premera abused its discretion in denying

2    coverage for the stay at Second Nature. See Boyd, 410 F.3d at 1178.

3        The Court finds that Premera abused its discretion by both failing to provide a reasoned

4    explanation of its Plan construction and by construing the Plan's exclusion so broadly that it

5    conflicts with the plain language of the Plan. See Boyd, 410 F.3d at 1178. None of the denials

6    provides anything more than a conclusory explanation of why Premera construed the exclusion

7    to apply to the mental healthcare services Second Nature provided. And the Court finds that

8    Premera's reading of the Plan conflicts with the Plan's language that provides a narrow exclusion

9    for recreational activities that do not expressly reach mental healthcare providers who treat

10   patients in an outdoor setting. Premera improperly denied coverage for A.B.'s stay, and the Court

11   therefore GRANTS Plaintiffs' Motion and DENIES Defendants' Motion on this claim.

12       The Court separately notes that Premera cannot claim that A.B.'s stay at Second Nature

13   was not medically necessary. Premera initial and secondary denials of coverage turned solely on

14   the basis of its reading of the Plan's exclusion. Even though the second denial included a medical

15   reviewer's opinion, the reviewer merely concluded that "[a]ccording to the terms of your health

16   plan, wilderness program programs are an exclusion from coverage." (AR 4151.) Premera

17   provided no medical opinion as to actual medical necessity. It was only in the third denial that

18   Premera first spoke of the medical necessity of A.B.'s stay. But by raising this issue so late in the

19   appeals process, Premera effectively denied the Parents of any opportunity to challenge this

20   determination because the only appeal process left was to request an IRO. As the Tenth Circuit

21   has pointed out, "ERISA procedural regulations require the administrator [to] provide the

22   claimant with a comprehensible statement of reasons for the [initial] denial." D. K. v. United

23   Behav. Health, 67 F.4th 1224, 1242 (10th Cir. 2023) (citation and quotation omitted); see also 29

24

C.F.R. § 2560-503-1(g). Premera failed to satisfy this standard, and it cannot justify its denial on this late-made basis. See Booton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997). On remand, Premera may not deny coverage based on a theory that the treatment was not medically necessary.

### 2.   Denial of Coverage at Catalyst Constitutes an Abuse of Discretion

Plaintiffs correctly argue Premera violated ERISA when it arbitrarily determined A.B.'s stay at Catalyst was no longer medically necessary after his first thirty days at the facility.

To analyze whether Premera abused its discretion in denying benefits, the Court finds it necessary to review first the letters of medical necessity provided by A.B.'s long-standing treating therapist, Wood, and his therapist at Second Nature, Glissmeyer. Both recommended that A.B.'s residential treatment at Catalyst was medically necessary treatment to make long-term gains in treating A.B.'s DSM-5 diagnoses and avoid relapse if returned home to an outpatient setting. (AR 264, 292.) Having seen A.B. the month before Premera's denial, Glissmeyer wrote:

> [T]here remains significant concern . . . regarding his risk for relapsing in the areas of opposition, anger, depressive symptoms, and substance abuse if he were to return to his home environment after completing our program. If any long-term gains are to be made, he must be in a residential or therapeutic boarding school setting after Second Nature so that he can practice and internalize the tools he learned at Second Nature. Returning to his home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to his previous level of functioning. [A.B.] remains highly susceptible to external pressures and has not yet internalized the ability to implement the coping strategies he has learned at Second Nature without a structure setting. [A.B.] transitioned to Catalyst Residential Treatment Center.

(AR 264.) Writing in September 2019, three months after A.B. started his stay Catalyst, Wood wrote that "[g]iven the persistence of [A.B.'s] symptoms over the years, despite continued engagement in behavioral, medication, and most recently, residential therapy, a continued more intense level of treatment continues to be necessary." (AR 292.) Wood was aware of

1   Glissmeyer's recommendation and opined that "[o]ngoing after-care treatment would be

2   necessary in an effort to achieve significant and lasting improvement of [A.B.'s] conditions."

3   (Id.) The Court notes that Glissmeyer's recommendation was made on June 1, 2019, and Wood

4   had not personally seen A.B. since February 2019. But both providers had recently worked

5   directly with A.B., knew of his substantial mental health history and the unique challenges he

6   faced. Their opinions are entitled to considerable weight. See, e.g., Dominic W. v. Northern

7   Trust Co. Employee Welfare Benefit Plan, 392 F. Supp. 3d 907, 917-19 (N.D. Ill. 2019). And

8   while neither Wood nor Glissmeyer is a physician, both provided mental healthcare therapy to

9   A.B. and their opinions may be sufficient to show medical necessity under the Plan's terms. (See

10  AR 2191 (stating that medical necessity covers services that "a physician, exercising prudent

11  clinical judgment, would provide," not that only a physician may support such a finding).)

12  Indeed, Premera has not argued and conceded at oral argument that a non-physician's opinion

13  can support a medical necessity finding.

14          The Court's analysis of Premera's denial also requires consideration of its determination

15  that A.B.'s first thirty days at Catalyst were medically necessary. This decision reinforces the

16  validity of Glissmeyer's and Wood's opinions, and suggests strongly that it was medically

17  necessary for A.B. to be treated at the level of care provided at Catalyst. This initial finding also

18  places Premera and the medical reviewers in the position of having to explain why A.B.'s stay

19  was no longer medically necessary.

20          The Court finds that Premera abused its discretion in determining that A.B. no longer

21  needed care at Catalyst. Premera's medical necessity determinations fail to explain how, given

22  his A.B.'s specific history and his treating therapists' recommendations, he had recovered

23  sufficiently from his conditions upon initial entry after thirty days that continued care was no

24

1    longer necessary at Catalyst. The decisions fails to provide reasoned explanations and the Court

2    is left with a firm and definite conviction that the decision is clearly erroneous. See Boyd, 410

3    F.3d at 1178. The Court sets forth its rationale by examining each of the denials.

4          The first denial contains so little specificity that it lacks any justifiable explanation of the

5    reasons why A.B. no longer required care at Catalyst. The denial states that A.B. could use a

6    lower level of care because he "did not show any of the situations" that might qualify for such

7    care, which included "angry outbursts," attempts to hurt or kill himself or others, destruction of

8    property, or "very serious psychiatric symptoms." (AR 4021.) But the denial letter also stated

9    A.B. might not need continued care because his symptoms had improved. (AR 4022.) The letter

10   is entirely vague and equivocates as to what rationale Premera relied on to deny coverage. (AR

11   4021-22.) This is not an adequately detailed explanation of why A.B. could be supported at a

12   lower-care facility and the letter lacks sufficient detail to allow Plaintiffs to respond and engage

13   in a meaningful dialogue. See Booton, 110 F.3d at 1463. The denial also fails to address A.B.'s

14   history, his treatment provider's recommendation, or the treatment notes and plans from

15   Catalyst.

16         The second denial similarly fails to provide any reasoned analysis. The denial letter

17   states:

18         You were not wanting to harm yourself or others. You were not hearing or seeing things
           that were not there. You were not so severely disturbed in thinking to require 24-hour
19         nursing supervision. You continued to make progress in your treatment that could have
           allowed you to be treated in a lower level of care, such as partial hospitalization.
20
     (AR 2080.) The letter also included a medical review performed by AllMed, noting that A.B.
21
     was not wanting to harm himself or others, had no hallucinations, was not disturbed sufficiently
22
     to warrant 24-hour nursing supervision, and continued to make progress in treatment "that could
23
     have allowed [him] to be treated in a lower level of care, such as partial hospitalization. (AR
24

ORDER ON CROSS-MOTIONS - 20

2107.) Neither the letter nor the medical reviewer acknowledges A.B.'s specific medical history or the recommendations of his treating providers that continued care outside of the home environment was necessary to treat his underlying conditions and DSM-5 diagnoses. The denial and medical review fail to explain how A.B.'s DSM-5 diagnoses could be treated at a lower level of care. And both the denial letter medical reviewer failed to cite any evidence that A.B.'s condition had improved since entry into Catalyst. The Court finds this denial to be arbitrary and irrational.

The final denial, the IRO, similarly fails to explain why A.B.'s continued stay was not medically necessary in light of his medical history and his treating providers' recommendation. The IRO states that "since 07/02/2019, there is no documentation that the claimant demonstrated any disorganized behavioral programs requiring 24 hours supervision, no homicidal or suicidal ideation, no hallucinations, no psychotic behavior, and no intensions of harm to others or himself." (AR 2305). But the medical reviewer did not explain how A.B. had stabilized after his first thirty days at Catalyst such that he could be treated in a lower level of care. The treatment notes from Catalyst show that on the thirtieth day of his stay, A.B. was still struggling, with "a little emotional breakdown in session [that] week" and was "not doing a lot of anything at Catalyst right now." (AR 727.) And the reviewer failed to address the July 8, 2019 treatment plan, which specifically outlined the current conditions relevant to each DSM-5 diagnosis and the need for further treatment. (AR 706-14.) The IRO did say that "[i]t appears that he claimant's condition could have been managed appropriately at a lower level of care such as Intensive Outpatient Program (IOP), aggressive medication management, and group therapy for adolescents as outpatients." (Id.) But the reviewer does not identify any specific change in A.B.'s condition that occurred after he began his stay at Catalyst that supports this reasoning. Having

made the determination that the initial stay was medically necessary, Premera's medical

reviewers needed but failed to point to some objective evidence that the continued stay was not

medically necessary. Indeed, the only things the IRO identifies as being absent (lack of harm to

self or others, lack of hallucinations, and disorganized or psychotic behavior) were also absent

from Nursing Assessment upon A.B.'s admission and the June 10, 2019 Psychiatric Medication

Evaluation. (AR 790-93.) The IRO's determination lacks sufficient reasoning or explanation of

the full record of A.B.'s symptoms and medical history to support the denial.

Premera abused its discretion by failing to provide a reasoned decision as to why A.B. no

longer needed treatment at Catalyst after his first thirty days. First, Premera's denials do not

address or recognize either of A.B's treating providers' determinations that A.B. required a long-

term stay in a residential program to address his DSM-5 diagnoses and avoid addiction relapse.

Premera failed to ask anyone at Catalyst to provide any contemporaneous opinion as to whether

A.B. required continued care at Catalyst and failed to address evidence from Catalyst that

continued care was necessary. And even though the IRO expressly listed Glissmeyer's and

Wood's recommendations, the IRO provided no reasoning as to why they lacked merit. Nor did

Premera state that the recommendations were unpersuasive because of the passage of time—

Premera only made this argument in this litigation, which is inadequate to satisfy Premera's

statutory burden in the appeals process. See 29 C.F.R. § 2560-503-1(g); D. K., 67 F.4th at 1242.

Second, Premera failed to point to what specific symptoms existing at the time of admission had

abated or ameliorated after the first thirty days that would support denial. None of the denials

provides any reasoning on this issue and it undermines the basis of Premera's denial. This is not

to say that Premera was bound to pay for any and all care because it had approved A.B.'s initial

stay. But having found A.B.'s initial stay medically necessary, Premera had to provide some

1   explanation as to how A.B.'s condition improved such that he could receive care at a lower level

2   of treatment. The denials utterly fail to make such an explanation. In sum, Premera abused its

3   discretion because it rendered decision without an explanation based on the full record of

4   evidence before it. See Boyd, 410 F.3d  at 1178 (9th Cir. 2005). Because Premera's denial failed

5   to analyze critical evidence before it, the Court is left with a "definite and firm conviction that a

6   mistake has been committed." Id. (citation and quotation omitted). The Court therefore

7   GRANTS Plaintiffs' Motion and DENIES Defendants' Motion on this claim.

8          Additionally, the Court finds Premera's reliance on the InterQual guidelines inadequate

9   to support its denial. First, the InterQual guidelines are not incorporated into the Plan itself,

10  making them advisory at best. See, e.g., Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1261 (3d

11  Cir. 1993) ("[C]ourts have refused to rely exclusively on particular third-party classifications

12  where the plan has not explicitly referenced them. . . ."); Pirozzi v. Blue Cross-Blue Shield of

13  Va., 741 F. Supp. 586, 591 (E.D. Va. 1990) (refusing to uphold coverage denial based on health

14  plan's internal "technology evaluation criteria" because "the criteria are not part of the Plan and

15  the Plan nowhere states that the Blue Cross criteria are determinative of a treatment's

16  experimental status"). Indeed, Premera only argues that the InterQual criteria are "[c]onsistent

17  with the Plan's requirements," not that they are part of the Plan. (Def. Opp. at 5.) Second, there is

18  no evidence in the record to back up Premera's argument that the medical reviewers were

19  tracking the InterQual guidelines to make their determination. None of the medical reviewers

20  explained how they applied the guidelines or what specific guidelines they considered. Third, the

21  InterQual guidelines in the record are so opaque and unexplained that they do not allow the

22  Court to assess whether Premera's denials are consistent with the InterQual guidelines. To this

23  end, Defendants' briefing inaccurately summarizes the applicable InterQual guidelines by failing

24

to track the time-based differences in required symptomology and provides no means of deciphering the guidelines. In sum, even if the InterQual guidelines were useful in assessing medical necessity, Defendants' denials failed to explain why they support denial of coverage.

Lastly, the Court rejects Premera's argument that it reasonably denied coverage because Catalyst did not meet the facility-specific requirements to qualify for coverage. It is true that Premera's initial denial noted that A.B. was not obtaining sufficient psychiatric evaluations, daily clinical assessments, treatment, or discharge planning. (AR 4022.) But as Plaintiffs pointed out in their appeals, Premera abandoned this reasoning in denying both the Level One and Level Two Appeals. As such, Premera waived this argument and failed to provide Plaintiffs with the means of challenging this determination. See Booton, 110 F.3d at 1463; see 29 C.F.R. § 2560-503-1(g). This Court rejects this as a basis to deny the claim for A.B.'s stay at Catalyst.

**C.     Parity Act**

As Plaintiffs concede, relief available under the Parity Act is equitable in nature and no further remedy is necessary where they receive adequate relief on their claims. See N.C. v. Premera Blue Cross, C21-1257 JHC, Dkt. No. 71 at 29 (W.D. Wash. Mar. 31, 2023) (citing Varity Corp. v. Howe, 516 U.S. 489, 515 (1996) ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief.")). Because the Court has granted Plaintiffs relief on their ERISA, 29 U.S.C. § 1132(a)(1)(B) claims, the Court finds that no further relief is appropriate. And while Plaintiffs have asked for declaratory relief and an order changing the Plan language, they fail to argue what specific Plan language should be reformed and the reasons why. Plaintiffs have failed to carry their burden to explain what further relief is necessary. For this reason, the Court DENIES as MOOT the Parity Act claims.

1

**CONCLUSION**

2      The Court finds that Premera abused its discretion in denying Plaintiffs' claims for

3   treatment at both Second Nature and Catalyst. The Court GRANTS Plaintiffs' Motion and

4   DENIES Defendants' Motion on Plaintiffs' ERISA claims and DENIES as MOOT Plaintiffs'

5   Parity Act claims. The Court DIRECTS entry of judgment in Plaintiffs' favor on the ERISA

6   claims.

7      But, on the record before it, the Court cannot make a determination of what sums are due

8   to Plaintiffs under the terms of the Plan. It appears the Parties agree on this point. As such, the

9   Court REMANDS the claims for coverage at Second Nature and Catalyst to Defendants to

10   approve and pay the claims consistent with this Order and the Plan. Defendants must complete

11   its review and determination of what sums are due to Plaintiffs for both the claims within 45

12   days of entry of this Order.

13      The clerk is ordered to provide copies of this order to all counsel.

14      Dated December 18, 2023.

15

16      Marsha J. Pechman
        United States Senior District Judge

17

18

19

20

21

22

23

24